IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| TERRY WATKINS, JR. | § | |
| VS. | § | CIVIL ACTION NO.  1:06-CV-292 |
| PRASAD SURAPENENI, ET AL. | § | |

MEMORANDUM OPINION

Plaintiff Terry Watkins, Jr., a prisoner previously confined at the Stiles Unit of the Texas Department of Criminal Justice, Correctional Institutions Division, proceeding *pro se* and *in forma pauperis*, brings this civil rights action pursuant to 42 U.S.C. § 1983 against Dr. Prasad Surapeneni, Regina Criswell, and the University of Texas Medical Branch Hospital in Galveston ("UTMB").[1]

Factual Background

Plaintiff alleges he was examined by defendant Surapeneni on March 9, 2006 at the Stiles Unit infirmary. Plaintiff complained of severe abdominal pain and vomiting, and told defendant Surapeneni that he thought he had appendicitis. After examining plaintiff's stomach, defendant Surapeneni gave plaintiff Diotame and placed him in an observation room. Plaintiff alleges he was vomiting and in pain during the forty-five minutes he spent in the observation room. Plaintiff alleges he was given a handful of Diotame tablets and sent back to his cell.

Plaintiff alleges he laid on his cell floor in pain and vomiting until 9:30 p.m. when he felt his appendix rupture. After a delay of one hour, plaintiff was taken to the infirmary. Plaintiff alleges he was examined by defendant Criswell, a registered nurse. Plaintiff alleges that he screamed in pain, but defendant Criswell said that he was faking the pain. Plaintiff was sent back to his cell.

---

[1] Plaintiff has moved to dismiss his claims against UTMB.

Plaintiff went back to the infirmary in the morning. Plaintiff was examined, an intravenous line was started, and arrangements were made to transfer plaintiff to UTMB. At UTMB, plaintiff was taken to surgery after tests showed his appendix was ruptured.

## Motion for Summary Judgment

Defendants contend they are entitled to summary judgment because they were not deliberately indifferent to plaintiff's serious medical needs. In support of their motions, the defendants submitted relevant portions of plaintiff's medical records (Exhibit A), the affidavit of an expert witness, Dr. Brian Zachariah (Exhibit B), and the affidavit of defendant Regina Criswell (Exhibit C).

Plaintiff's medical records show that he was seen at the Stiles Unit infirmary at 3:28 p.m. on March 9, 2006. (Ex. A at 199.) Plaintiff complained that his lower abdomen hurt "from one side to the other," and that he had severe pain in the right groin area. (Ex. A at 199.) Plaintiff's blood pressure was 122/56, his pulse was 74, and his temperature was 96.4 (Ex. A at 199.) Dr. Zacharias states that these vital signs are normal. (Ex. B at 2.) The nurse on duty, Janet Broussard, completed a Nursing Assessment Protocol for Lower Gastrointestinal Symptoms. (Ex. A at 199-201.) The medical records show that, on abdominal palpation, plaintiff had tenderness to the abdomen, but not rebound tenderness. (Ex. A at 199.) Dr. Zacharias states that nothing on the Protocol or in the vital signs identified Mr. Watkins as a patient with high risk for appendicitis. (Ex. B at 2.) Plaintiff's symptoms, accompanied by nausea and vomiting, can indicate other conditions such as constipation, a food-borne illness, or an intestinal virus. (Ex. B at 2.) Defendant Surapeneni ordered pepto bismuth tablets for the plaintiff and placed him in observation for two hours. (Ex. A at 201.) Defendant Surapeneni ordered plaintiff to be returned to his cell if no vomiting or fever was noted

during the observation period. (Ex. A at 201.) Plaintiff was to return for a follow-up appointment in the morning, or as needed if symptoms persisted. (Ex. A at 201.)

Plaintiff's medical records show that he returned to the infirmary at 8:56 p.m., complaining that his entire abdomen hurt. (Ex. A at 195.) Defendant Criswell saw plaintiff and completed a Nursing Assessment Protocol for Lower Gastrointestinal Symptoms. (Ex. A at 195-98.) Defendant Criswell noted that plaintiff had been seen earlier for the same complaint and released, and that he would be seen the next morning for a follow-up. (Ex. A at 195.) Plaintiff's blood pressure had risen to 155/82, his pulse was 104, and his temperature was 97.1. (Ex. A at 195.) The medical records show that defendant had abdominal tenderness, but not in any specific area, and he did not have rebound tenderness (Ex. A at 195.) Defendant Criswell states that plaintiff's condition did not seem to be an emergency when she saw him, and nothing about plaintiff's condition indicated to her that he needed urgent care. (Ex. C at 2.) Defendant Criswell states that she believed that, based on his subjective complaints and objective vital signs, plaintiff could safely wait until his appointment the following morning for additional medical attention. (Ex. C at 2.) After the exam, plaintiff was released to his housing area. (Ex. A at 197.)

Although plaintiff's blood pressure was 155/82 and his pulse was slightly elevated, Dr. Zacharias finds it significant that plaintiff did not have a fever when he returned to the clinic. (Ex. B at 2.) Dr. Zacharias states, "Although Mr. Watkins' return to the infirmary with the same symptoms would slightly elevate a provider's level of concern, or what is known as the 'index of suspicion,' his complaints and condition at this time were still consistent with a number of less-serious conditions, including food-borne illness or an intestinal virus." (Ex. B at 2.) Dr. Zacharias

states that there is nothing in the medical records from March 9 showing that the defendants were aware of, and disregarded, an excessive risk to plaintiff's health. (Ex. B at 2.)

Plaintiff returned to the infirmary the next day at 8:26 a.m. (Ex. A at 179.) At that time, plaintiff's blood pressure was 89/58 and his pulse was 159. (Ex. A at 179.) Defendant Surapeneni ordered intravenous fluids and requested that plaintiff be transferred to UTMB by ambulance. (Ex. A at 179.) Later that evening, plaintiff's ruptured appendix was removed. (Ex. A at 181.)

In his affidavit, Dr. Zacharias states:

> Primary care medical providers, such as those assigned to render medical or nursing care in the correctional setting, are similar to primary care physicians and nurses in the so-called "free world." Such providers make a list, known as a differential diagnosis, ranking conditions from the most-likely to least-likely, with an emphasis on the probability of the diagnosis being correct; the relative seriousness of the disease is less of a factor on the rank order of a primary care physician's list than these other factors. Often, the most likely is also the less-serious condition. A primary care physician, therefore, presented with the symptoms and vital signs that Mr. Watkins had throughout March 9, 2006 might very likely make a differential diagnosis of food poisoning or a stomach virus, which are more likely, rather than appendicitis.
>
> The approach of the primary care physician contrasts with that of emergency medicine physicians, who rank our potential diagnoses based on what is the most serious, but often less-likely, condition. In the emergency setting, we might conduct a Complete Blood Count (CBC) test to determine whether the white blood cell count is elevated, which could indicate some type of infection. Even this test, however, cannot specifically determine the nature of the infections, and a patient's white blood cell count can be elevated simply by vomiting. In the emergency setting, such a CBC would likely be followed by a CT scan of the abdomen. In the correctional setting, or in a family practice, the standard of care does not require such tests for patients presenting the symptoms and vital signs that Mr. Watkins displayed.

(Ex. B at 2-3.)

<u>Standard of Review</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c). A fact is material if it could affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Instone Travel Tech Marine & Offshore v. International Shipping Partners*, 334 F.3d 423, 427 (5th Cir. 2003). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Instone Travel Tech*, 334 F.3d at 427.

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003).

Because summary judgment is a final adjudication on the merits, courts must employ the device cautiously. *Hulsey v. State of Texas*, 929 F.2d 168, 170 (5th Cir. 1991); *Jackson v. Procunier,* 789 F.2d 307 (5th Cir. 1986). In prisoner *pro se* cases, courts must be careful to "guard against premature truncation of legitimate lawsuits merely because of unskilled presentations." *Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989) (*quoting Murrell v. Bennett,* 615 F.2d 306, 311 (5th Cir. 1980)).

Analysis

*Constitutional Claims*

Although the Eighth Amendment does not explicitly mandate a certain level of medical care for prisoners, the cruel and unusual punishment clause has been interpreted to impose a duty on prison officials to provide inmates with adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999). A prison official's deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment, whether the indifference is manifested by prison doctors or by prison guards. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 754 (5th Cir. 2001).

An Eighth Amendment claim consists of two components--one objective and one subjective. *Farmer*, 511 U.S. at 839. To satisfy the objective requirement, the plaintiff must prove that he was exposed to a substantial risk of serious harm. *Id.* at 834; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). The plaintiff must also demonstrate that the defendant was deliberately indifferent to that risk. *See Farmer*, 511 U.S. at 834; *Lawson*, 286 F.3d at 262. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the defendant was aware of an excessive risk to plaintiff's health or safety, and yet consciously disregarded the risk. *Farmer*, 511 U.S. at 840-41; *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002); *Stewart*, 174 F.3d at 534.

Under exceptional circumstances, the defendant's knowledge of a substantial risk of harm may be inferred by the obviousness of the risk. *Farmer*, 511 U.S. at 842; *Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994). Medical records

of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

Mere negligence, neglect, or medical malpractice does not rise to the level of a constitutional violation. *Domino*, 239 F.3d at 756 ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."); *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999) ("[A]llegations of malpractice or negligence will never state a claim under the Eighth Amendment."); *Stewart*, 174 F.3d at 534. Nor does an inmate's disagreement with his medical treatment amount to an Eighth Amendment violation. *Stewart*, 174 F.3d at 537; *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). "Rather, the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) ).

In this case, the defendants' conduct does not rise to the level of egregious intentional conduct required to satisfy the deliberate indifference standard. *See Gobert v. Caldwell*, 463 F.3d 339, 351 (5th Cir. 2006). When plaintiff first arrived at the infirmary on March 9, 2006, defendant Surapeneni examined him, placed him in observation, and ordered medication for his stomach. Plaintiff alleges that he told defendant Surapeneni that he was suffering from appendicitis, but his symptoms at that time were also indicative of other, more common illnesses. Plaintiff also alleges that he was returned to his cell against defendant Surapeneni's orders because he continued to vomit while he was under observation. However, there is no indication that defendant Surapeneni was told that plaintiff was continuing to vomit.

During his second visit to the infirmary that evening, plaintiff was examined by defendant Criswell. Defendant Criswell followed the nursing protocol and concluded that plaintiff could wait until his appointment for additional medical care. Plaintiff contends that defendant Criswell said that plaintiff was faking his illness. Accepting this allegation as true, plaintiff has not stated a constitutional claim. Defendant Criswell examined plaintiff and, at that time, his symptoms did not suggest to her that he needed immediate medical treatment. There is no evidence that defendant Criswell was aware of a substantial risk to plaintiff's health, and deliberately chose to disregard that risk.

Plaintiff was misdiagnosed by the defendants, and his appendix ruptured as a result. However, there is no indication from the competent summary judgment evidence that either of the defendants was aware that plaintiff was suffering from appendicitis on March 9, 2006. When plaintiff returned to the infirmary on March 10, he was immediately given IV fluids and arrangements were made to take him to UTMB. The failure to properly diagnose plaintiff the day before is, at most, negligence, but negligence does not rise to the level of a constitutional violation.

*State Tort Claims*

Plaintiff has also asserted causes of action arising under state law. In accordance with 28 U.S.C. § 1367(c), the district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. As the federal claims should be dismissed, the court should decline to exercise supplemental jurisdiction over the state law claims.

Conclusion

Plaintiff has not demonstrated that the defendants were deliberately indifferent to his serious medical needs. Therefore, summary judgment should be granted in favor of defendants Surapeneni and Criswell. Plaintiff's motion to dismiss defendant UTMB should be granted. The court declines to exercise supplemental jurisdiction over the state law claims. A final judgment will be entered in accordance with this Memorandum Opinion.

**SIGNED** this the **17** day of **September, 2007.**

_____
Thad Heartfield
United States District Judge